## KETCHUM *v.* DUNCAN.

### HAYS *v.* KETCHUM.

1. While it is true that it is essential to a sale that both parties should consent to it, yet the consent of the former owner need not be expressly given, but may be inferred from the circumstances of the transaction.

2. The title to interest-coupons passes from hand to hand by mere delivery. A transfer of possession is presumptively a transfer of title, but does not import a guaranty of payment.

3. An estoppel *in pais* can be set up only by a person who has been misled to his injury.

4. The court, on considering the facts in this case, *holds* that the coupons of May and November, 1874, of the bonds of the Mobile and Ohio Railroad Company, represented as owned by Alexander Duncan, are existing liabilities of that company protected by its first mortgage, and that they have no equity superior to that of the bonds from which they were taken, or of the subsequently maturing coupons.

APPEALS from the Circuit Court of the United States for the Southern District of Alabama.

The facts are stated in the opinion of the court.

The first case was argued by *Mr. George Hoadly* and *Mr. E. L. Andrews* for the appellants, and by *Mr. John A. Campbell* and *Mr. F. N. Bangs* for the appellees.

The second case was argued by *Mr. John A. Campbell* and *Mr. F. N. Bangs* for the appellants, and by *Mr. George Hoadly* and *Mr. E. L. Andrews* for the appellees.

MR. JUSTICE STRONG delivered the opinion of the court.

The principal question attempted to be raised by the appellants is, whether the deed of trust or mortgage of the railroad company, executed in 1853, is a valid security, not merely for the bonds therein described, but for the interest-coupons that fell due in May and November, 1874, and which are now held by Alexander Duncan. Assuming that the question is properly before us, we proceed directly to consider it. On the part of the appellants, it is claimed that the coupons were paid when they became due, or, secondly, if not, that Duncan, Sherman, & Co., and their assignee, Alexander Duncan, are estopped by fraud and breach of trust from setting them up as first mort-

gage liens, that is, as entitled to the benefit of the lien of the mortgage of 1853; and, thirdly, that the coupons, if not paid when they fell due, have since been paid to Duncan, Sherman, & Co., under a special appropriation of the net earnings of the railroad, which the firm diverted to other uses. This, it is said, appears from a proper marshalling of the assets of the railroad company.

On the other hand, Alexander Duncan, who obtained those coupons from Duncan, Sherman, & Co., denies that they were paid when they fell due, or have ever been paid. He denies that there is any estoppel, arising from fraud or breach of trust, against claiming the coupons to be entitled to the lien of the first mortgage. And he denies that there has been any misappropriation of the net earnings of the railroad company, which, under any proper marshalling of the assets, shows that the coupons were paid to the firm from which he obtained them. He insists that the coupons, instead of having been paid, became the property of Duncan, Sherman, & Co., either by purchase or transfer from the former owners, at or about the times when they fell due, and that he has succeeded to the rights of those purchasers. It is to the support of one or the other of these opposite averments of the parties that most of the evidence in this voluminous record has been directed.

If the coupons have not been paid in fact, or equitably by funds which Duncan, Sherman, & Co. should have appropriated to paying them, and if there be no estoppel against asserting them, it is not claimed that they are not protected by the mortgage as fully as the bonds from which they were taken.

What, then, is the evidence of actual payment? The coupons were produced uncancelled, and they were proved before the master appointed by the Circuit Court. If there were nothing else in the case, Alexander Duncan's possession of them would raise the presumption that he became the holder in the usual course of business, for value, at their date, and before they became payable. The appellees claim the benefit of this presumption; but it is completely rebutted by proof that neither Duncan, Sherman, & Co., nor Alexander Duncan, acquired any ownership of them before they fell due. We are then confined to a consideration of what occurred at that time and thereafter.

There are some things so clearly established by the evidence that they must be considered beyond doubt. They are these : —

1. Neither the coupons due in May, 1874, nor those due in November, 1874, were paid by the railroad company.

2. They were not paid with money or funds furnished by the railroad company.

3. They were not paid by any one in pursuance of an agreement with the railroad company to pay them for or on behalf of the debtors, or in extinguishment of the debt.

Thus far the evidence is full and uncontradicted.

4. Duncan, Sherman, & Co., who furnished the money which the former owners received for the coupons, did not intend to pay them in any such sense as to relieve the railroad company from its obligation  By advancing the money, and directing its payment to the holders of the coupons, they intended to take the place of those holders, and to become the owners of the evidences of the company's debt; or, in other words, they intended to obtain for themselves the rights of purchasers. They did not advance the money either to or for the company. Certainly, they did not intend to extinguish the coupons. Of this the evidence is very full. The firm had made advances to the company to pay the coupons due in November, 1873, as well as interest due in January and March, 1874, amounting to a very large sum. These advances had not been repaid when the May coupons fell due. Those coupons the company was then utterly unable to take up. In near prospect of this inability, William B. Duncan, the head of the firm, on the 28th of April, 1874, telegraphed from New York to the company at Mobile that his firm would purchase for their own account sterling coupons, payable in London. The firm also telegraphed to the Bank of Mobile and to the Union Bank of London to purchase the coupons there presented for them, charging their account with the cost, and transmitting the coupons uncancelled. The railroad company acceded to the proposition made them, and the Bank of Mobile and the Union Bank did also. Similar arrangements were made respecting the November coupons, except that Duncan, Sherman, & Co. arranged with the Crédit Foncier to make the purchase in London. Both these banks were agents of the firm in the transactions. They were not agents of the

railroad company. They had no funds of the company in hand. In taking up the coupons, they acted for Duncan, Sherman, & Co., charged the cost to their account, transmitted to them the coupons taken up without cancellation, and were repaid by them. In view of these facts, it is manifest that, whatever may have been the nature of the transaction by which the coupons passed from the hands of the former holders into the possession of Duncan, Sherman, & Co., it was not intended by the firm to be a payment or extinguishment of the company's liability. Neither they, nor the company, nor the Bank of Mobile, nor the Union Bank, nor the Crédit Foncier, so intended or understood it. Was it, then, a payment? It is as difficult to see how there can be a payment and extinguishment thereby of a debt without any intention to pay it as it is to see how there can be a sale without an intention to sell.

But that the coupons were either paid, or transferred to Duncan, Sherman, & Co. unpaid, is plain enough. The transaction, whatever it was, must have been a payment, or a transfer by gift or purchase. Was it, then, a purchase? It is undoubtedly true that it is essential to a sale that both parties should consent to it. We may admit, also, that " where, as in this case, a sale, compared with payment, is prejudicial to the holder's interest, by continuing the burden of the coupons upon the common security, and lessening its value in reference to the principal debt, the intent to sell should be clearly proved." But the intent to sell, or the assent of the former owner to a sale, need not have been expressly given. It may be inferred from the circumstances of the transaction. It often is. In the present case, the nature of the subject cannot be overlooked. Interest-coupons are instruments of a peculiar character. The title to them passes from hand to hand by mere delivery. A transfer of possession is presumptively a transfer of title. And especially is this true when the transfer is made to one who is not a debtor, to one who is under no obligation to receive them or to pay them. A holder is not warranted to believe that such a person intended to extinguish the coupons when he hands over the sum called for by them and takes them into his possession. It is not in accordance with common experience for one man to pay the debt of another, without receiving any

benefit from his act. We cannot close our eyes to things that are of daily occurrence. It is within common knowledge that interest-coupons, alike those that are not due and those that are due, are passed from hand to hand; the receiver paying the amount they call for, without any intention on his part to extinguish them, and without any belief in the other party that they are extinguished by the transaction. In such a case, the holder intends to transfer his title, not to extinguish the debt. In multitudes of cases, coupons are transferred by persons who are not the owners of the bonds from which they have been detached. To hold that in all these cases the coupons are paid and extinguished, and not transferred or assigned, unless there was something more to show an assent of the person parting with the possession that they should remain alive, and be available in the hands of the person to whom they were delivered, would, we think, be inconsistent with the common understanding of business men.

In the present case, there was much in the circumstances attending the transfer of the possession of the coupons from the original holders to Duncan, Sherman, & Co., or their agents, tending to show that those holders could not have believed the payment made to them extinguished the securities, so that they could not thereafter be set up by the transferees against the railroad company. Those circumstances, certainly, should have awakened their attention and led them to inquiry. The coupons were not paid in the usual manner, or at the usual place, or by the persons accustomed to pay them. Before May, 1874, the coupons paid at Mobile had always been paid at the office of the company by its officers, and had been left there. They had been paid, it is true, by checks drawn on the Bank of Mobile; but the holders had received those checks only on the delivery of the coupons to the company. In regard to the May and November coupons of 1874, this usage was changed. The coupons were not left at the company's office. They were taken there for verification, and then returned to the holders, with directions to take them to the bank, where they would be paid; but no checks drawn upon the bank were given to the holders. Some of them knew the company was not paying those coupons. Others inquired, and were told the bank would

purchase. Others did not know the company would not pay, and they made no inquiry. At the bank, the holders received the amounts due on the coupons, and left them in the possession of the bank: but, as they brought no checks, they must have known that the bank had no vouchers for its payments, unless the coupons continued in force in the hands of the new possessors; and hence it is a fair presumption, that, when they delivered the possession, they assented to a transfer of ownership. They must have expected that the bank would hold the coupons as claims against the railroad company; and with that expectation they transferred them to the bank. What was that but tacit consent to a sale?

Similar remarks might be made respecting the coupons presented in London. On the 28th of April, 1874, Duncan, Sherman, & Co. sent a telegram to the Union Bank, requesting it to pay the May coupons for their account and forward them uncancelled. These instructions the bank followed. Parties who presented the coupons there received the amount, and handed over the security, so far as it appears without a word. Here, too, it is a reasonable presumption, that both parties supposed and expected that the coupons remaining uncancelled would be preserved, and held as claims against the railroad company.

The coupon-holders who presented their coupons in New York were informed that Duncan, Sherman, & Co. were purchasing them.

The manner in which the November coupons passed from the holders was not essentially different. There were, however, notices that the Bank of Mobile was purchasing them posted in the bank, and in the office of the railroad company. In London, they were taken by the Crédit Foncier, with which Duncan, Sherman, & Co. had arranged to purchase them; and notice of an intention to purchase was publicly given by the London house.

If, now, in addition to this, it be considered that none of the original holders of these coupons, with perhaps one exception (and he not an appellant), have hitherto denied the sale and purchase, and that not one has reclaimed the coupons and thus disaffirmed any sale, it seems to us a just conclusion, that they must be held to have assented to the purchase which was cer-

tainly intended by those who gave them the money and thereby acquired the possession.

It is argued, however, by the appellants, that Duncan, Sherman, & Co., and, consequently, Alexander Duncan, their assignee, are estopped from claiming that the May and November coupons are unpaid. Precisely wherein this alleged estoppel consists, we are unable to discover. It is said, that setting up the coupons now as an existing claim, entitled to the protection of the mortgage of the railroad company, is a fraud upon the bondholders secured by it. This we cannot see. If the original holders of the May and November coupons had sold them to some one else than Duncan, Sherman, & Co., it could not be doubted those vendees would have an unimpeachable right, equal at least to the right of the bondholders. Such a sale would have worked no injury to the bondholders of which they could complain. They are in no worse condition now than they would have been in the case supposed. If there be any difference between that case and the present, it must be found in the relation William B. Duncan, and the firm of which he was a member, held to the railroad company and to its creditors. The firm had been financial agents of the company, and Duncan had been a director several years. In April, 1874, he was elected its president. It was his duty, therefore, to have regard for the interests of the company, its stockholders, and, measurably, of its creditors. He was bound to entire good faith. This may be conceded. But was it unfaithfulness to the company, or to the bondholders of the company, to purchase either the bonds or the coupons falling due, which the company was unable to pay as they fell due? Was it unfaithfulness thus to save the company from going into immediate bankruptcy? This cannot be maintained. Subsequent events may show that it would have been better for the bondholders had the May and November coupons been suffered to go to protest, or had the company acknowledged publicly its inability to pay them when they fell due, though it is not proved that it would have been better. But the duty of Duncan was to do what in his judgment at the time was the best thing for all persons for whom he was a trustee. It surely was not his duty to permit the coupons to go into default. Still less, as it

appears to us, was it a breach of trust in him to purchase the coupons and hold them, in order that the company might have time to provide for their payment. The company was informed of his intention to make the purchase, and its consent was given. It can, therefore, make no claim that Duncan, Sherman, & Co. are estopped from asserting that they acquired possession of the coupons by purchase; and the company makes no such assertion. The bondholders under the first mortgage, or rather a very small number of them, however, do. They say, had the coupons not been purchased, had the company been known to have defaulted upon them, the trustees in the mortgage might have taken possession of the railroad, for the benefit of the bondholders. Hence they say they were injured by the purchase, if there was one. But, as we have said, they would have been equally injured if the purchase had been made by a stranger. There would have been no estoppel against a stranger. And William B. Duncan can be in no worse position, unless it be shown that he was guilty of bad faith in making the purchase through his firm.

Moreover, it is necessary to notice who sets up this plea of estoppel. An estoppel *in pais* does not operate in favor of everybody. It operates only in favor of a person who has been misled to his injury, and he only can set it up. If, therefore, there be any estoppel in this case, it must be in favor of some bondholder (if any there was) who was led to believe, by the action of William B. Duncan, that the railroad company was, in May and November, 1874, paying the coupons of the first mortgage, then falling due, and paying them in order to extinguishment; but no such bondholder asserts such an estoppel. So far as it appears, no one of the appellants was so misled. No one of them can claim an estoppel which is personal, and of which only the person misled to his hurt can avail himself. Indeed, it does not appear that any one of the witnesses (very few in number) who supposed the coupons were being paid when they received their money from the Bank of Mobile, was at the time, or is now, the holder of a single first-mortgage bond. Nor is there a single coupon-holder who now claims that he was misled or deceived by any of Duncan, Sherman, & Co.'s agents, by the Bank of Mobile, or the Union Bank of London, or by

the Crédit Foncier. It is impossible, therefore, to see how there can be any estoppel, or wherein can be found any fraud in purchasing the coupons.

The appellants have expended much argument to show that Duncan, Sherman, & Co., and Alexander Duncan, their assignee, are not entitled by subrogation to any rights of the persons who transferred to them the possession of the coupons. This may be admitted; but the argument is inapplicable to the case. Subrogation is an equitable right. The right claimed here is a legal one, obtained by transfer of the coupons, as distinguished from payment. Numerous authorities have been adduced to maintain that there is no right of subrogation. They are all wide of the mark. The case of *The Union Trust Company of New York* v. *The Monticello & Port Jarvis Railroad Co.* (63 N. Y. 311) is the one principally relied upon. There it appeared that one Smith had made an agreement with a railroad company to advance the money to pay coupons on the company's bonds when they should become due, holding the coupons for security. In pursuance of this agreement, he went to the plaintiff, where the coupons were payable, and left with it the money to pay the coupons when presented; it agreeing with him to take and deliver them to him uncancelled, that he might hold them as security for the money advanced. It was held that Smith was not entitled to share ratably in the proceeds of the mortgage to secure the bonds and coupons with other bond and coupon holders; but in that case the money was substantially advanced to the company, and the coupons were paid by it through its agent at the place where they were payable. The coupons were paid with money advanced to the company, and under an agreement to make such an advance to pay. These coupon-holders had a right to conclude that the money was paid by their debtors. We gather the facts from the opinion of the court. The case, therefore, bears very slight resemblance to the present. It was not a case of subrogation; nor was it a case of purchase or transfer: it was a case of agency for the debtor.

It is next contended by the appellants that, even if Duncan, Sherman, & Co. did become the owners of the coupons, by purchase or transfer, the firm received from the railroad company sums of money sufficient to pay what had been paid for the

coupons, and which it ought to have applied to their extinction. This raises a question of appropriation. The facts exhibited by the evidence are these: When, in April, 1874, William B. Duncan became the president of the railroad company, his firm was a large creditor of the company for money lent, and for advances made to pay the interest of the first-mortgage bonds due in 1873. And there was then a large floating debt, amounting, at the beginning of 1874, to about $1,500,000. Of this floating debt, nearly $200,000 were due to his firm, more than three-quarters of which consisted of a temporary loan made to the company, to enable it to pay its interest and meet its current liabilities. At the same time, the May interest on the first-mortgage bonds was about coming due, and the company had no means to meet it. In these circumstances, the board of directors of the company, on the 28th of April, 1874, in the absence of Duncan, passed the following resolution: —

"*Resolved*, that the net earnings of the company, after payment of the current expenses, be pledged for repayment of advances obtained by the president, for the purpose of meeting the May interest; and that the floating debt, in the shape of bills payable, be extended, so far as practicable, to next winter; and that credits so extending shall be secured by pledge of consolidated bonds in the hands of Bank of Mobile, or at such other bank or place as may be determined by the vice-president, in trust, at the rates of seventy-five cents."

This, it is contended by the appellants, was a specific appropriation of the net earnings of the road to the payment of the May interest, which the president was bound thus to appropriate, in preference to paying the floating debt, or any thing except current expenses. Whether it was or not, we will presently consider.

The net earnings of the road during the year 1874 (assuming that they all went into the hands of Duncan, Sherman, & Co.), together with the proceeds of sales of company-bonds, amounted to about $800,000. The annual interest of the company's bonds was considerably more than that sum. But it was necessary to keep the floating debt afloat; and that could be done only by partial payments and renewals, and by pledging collaterals.

Had that debt not been kept afloat, the company must at once have suspended operations and ceased making earnings. Accordingly it was reduced and extended. It was reduced over $280,000 during the year; and included in the reduction was a payment of $150,000 to Duncan, Sherman, & Co., to reimburse their temporary loan, and some $24,000 more on their general account; leaving still some $17,000 due to them beyond what was due on the May and November coupons they had purchased. The remainder of the net earnings was used to pay overdue coupons of the previous year, interest on the floating debt, interest on the company's convertible and other bonds, claims in judgment, and other pressing liabilities. All the resources of the company were thus disposed of.

It is obvious, therefore, that in the latter part of April, 1874, unless the company could be relieved from immediate demand for payment of the May coupons, it would be in the power of its mortgage creditors to take possession of the road and force a foreclosure. And unless the floating debt could be taken care of, for which reliance must be placed mainly on the future net earnings, equal disaster might be expected from that direction. It was when the company was in this condition the resolution of April 28, 1874, was passed. It contemplated the possibility of obtaining advances to the company in order to meet the imminent claims for payment of the coupons, and it offered a pledge of net earnings as a security for such advances or loans to the company. But no such advances or loans were made by anybody. They had been made the year before; but none were made or agreed to be made to enable the company to pay the May interest. There never came into existence, therefore, any debt for which the earnings were pledged by the resolution. And, even if the purchase of the coupons by Duncan, Sherman, & Co. could be considered advances to the company to enable it to pay the coupons, the pledge made by the directors' resolution was not a pledge to the coupon-holders. It was a pledge for the benefit of the firm, which it was competent for the firm to forego without losing its claim as transferees of the coupons upon the railroad company.

There was, then, no misappropriation of the company's funds by William B. Duncan, — no payment by him of which either

the company or the bondholders have any reason to complain. And there is no foundation for the claim now made, that the payments out of the net earnings, applied to the payment of coupons of former years, to the reduction of the floating debt, and to the satisfaction of interest upon it, should have been made in discharge of the May and November coupons.

The exact net earnings of the year 1874, as it appears from the report of the directors for that year, was $707,865.04. These were disposed of as follows : —

| | |
|---|---:|
| 1. Paid interest-coupons matured in 1872 and 1873 . | $139,296.35 |
| 2. Interest-coupons matured in 1874, none of them those of May and November  . , . . . . . . | 197,970.70 |
| 3. Interest paid to secure renewal of floating debt and to prevent proceedings against the company on the part of the holders . . . . . . . . . | 118,346.97 |
| 4. Paid on account of floating debt to prevent sacrifice of securities belonging to the company . . . . | 281,948.85 |
| Total . . , . . . . . . . | $737,562.87 |

In view of this, it cannot be maintained, either that the coupons of May and November, transferred to Duncan, Sherman, & Co., were paid, or that, in obedience to any rule of law or equity, the net earnings of the road should have been applied in payment of them. They are, therefore, existing liabilities of the railroad company, and protected by the first mortgage.

But we think they have no equity superior to that of the bonds from which they were taken, or the subsequently maturing coupons. The mortgage was given as a security for the principal of the bonds as well as the interest, with no priority to either. The coupons are mere representatives of the claim for interest. The obligation of the debtor evidenced by them cannot be higher, nor entitled to greater privileges, than it would be had the bonds, in their body, undertaken the payment of interest. Cutting them from the several bonds of which they were a part, and transferring them to other holders, can give them no increased equities, so far as we can perceive. Had they been assigned with a guaranty of payment, it may well be they would be entitled to payment before the assignors could claim the fund. Then they might have an

equity to prior payment growing out of the guaranty. But there was no such undertaking of the assignors in this case. A mere transfer or assignment does not import a guaranty. At most, it warrants title, not solvency of the debtor, or collectibility of the chose assigned. A transfer or assignment of a claim, or part of a claim, secured by a mortgage given to protect that claim, in common with other claims contemporaneously originating, would seem to refer the transferee to the common security, and measure his rights and equities by that. It is in vain to urge that as between the person transferring and the transferee there is an equity, or even moral obligation, if it was the intention of the parties to participate, "*pari passu*," in the proceeds of the property pledged as a security. And such an intention may well be inferred from an assignment or transfer without guaranty. The meaning of such a transfer without more is that the transferee takes precisely the rights of the person from whom he obtains his title, and no more. But certainly such a transfer cannot have the effect of giving to the transferee greater rights than those created by the mortgage. *Dunham* v. *The Cincinnati, Peru, &c. Railway Co.*, 1 Wall. 254 ; *Gordillo* v. *Wiquetin*, L. R. 5 Ch. 287.

The mortgage in this case secures no priority to the coupons past due, nor to those first due. It places all bondholders and coupon-holders on the same level. It requires the trustees, in case of a sale, to apply the residue of the proceeds, after deducting costs, charges, &c., " to pay the principal and interest which may be due on the bonds issued," as recited, rendering the balance, if any, to the company, plainly meaning that the bonds and interest due (that is, owing or contracted to be paid) are to share in the application. By the terms of the mortgage the holders of the coupons of May and November, 1874, are therefore to have no preference over the bondholders and other coupon-holders.

We concur, therefore, in the decree of the Circuit Court, so far as it determined the priorities of the parties.

It remains only to consider the terms of the sale ordered. That a sale was properly directed, rather than a strict foreclosure, is quite evident. It was the object of all the consolidated bills to procure a sale ; and, if there was not assent by all

parties, there was at least no objection to it.   A strict fore
closure would not have converted the property into money.   It
would, in fact, have required the creditors to advance more
funds to pay the costs and expenses.   This no bondholder could
justly require from his associates..   Besides, a strict foreclosure
would not be a winding up of the matter.   It would leave an
undivided beneficial interest in an unmanageable property in
the hands of a large number of persons; who are very likely to
disagree in regard to its use.   The same observations might be
made respecting a purchase by a trustee for the benefit of all
the lien creditors.   Such a purchase would convert them all
into tenants in common, and probably give rise to endless dis-.
cussion.   Assuming that it was competent for the court, on
bills praying for a sale and payment thereby of debts due, to
compel creditors to take, in lieu of their personal rights, undi-
vided interests in realty, which may be doubted, what could
the trustee do after he had become the purchaser?   Could he
operate the railroad, at his discretion, through four States and
in as many jurisdictions?   Or would the court have placed the
property again in the hands of a receiver?   If so, what progress
would have been made in securing payment of the creditors'
bonds?   What advance from the position in which the creditors
now are, since the road is now in the hands of a receiver?   It
is too plain for any further comment that neither a strict fore-
closure, nor a purchase by a trustee to buy, would have been
for the interest of any bondholder.

The main objection to the terms prescribed by the Circuit
Court for conducting the sale ordered, appears to be that they
give superior advantages to some of the bond and coupon
holders.   The masters appointed to make the sale were, by the
decree, required to exact from any bidder, before making an
adjudication to him, a deposit of $50,000 in money, to pay
costs and expenses, and a further deposit of $100,000 in money,
or of the bonds or coupons described in the deed of trust and
master's report, as a part of the debt secured by the deed.   The
decree further ordered that the masters might receive, in pay-
ment from the highest and last bidder, bonds and coupons
which form a part of the first-mortgage debt ascertained to be
due or owing by the master in his report, and sustained by the

opinion of the court; " provided, however, that a sum sufficient to pay the costs, charges, and expenses of the trust as above mentioned, whether exceeding the said cash deposit or not, and also to provide for the payment of the *pro-rata* dividend which shall be due or owing to the owners of other bonds and coupons secured under the deed of trust, must be paid in money; and provided also, that if the said mortgage property shall be bid off, directly or indirectly, by, for, or in behalf of the bondholders and creditors who have or shall have entered into and subscribed the agreement for the readjustment of the securities of said company, dated Oct. 1, 1876, commonly called the agreement of reorganization, then and in that case all and every bondholder and creditor of said company not having already entered into and subscribed said agreement, who shall, on or before the first day of September next, enter into and subscribe the same, and deposit their securities with the Farmers' Loan and Trust Company, in the city of New York, or with the Bank of Mobile, in the city of Mobile, as provided by said agreement, shall be, and they are hereby, allowed to participate in said bid and purchase, on the same terms, and on an equal footing in all respects, according to the character of their claims respectively, with the said bondholders and creditors who have heretofore entered into and signed said agreement."

It is said this enables those who have subscribed to that agreement, and who are a large majority of the bondholders, to purchase on paying a much less sum in money than would be required of other bondholders who have not signed the agreement. This is true; but we do not perceive that it is inequitable. After all, it makes no distinction against the minority which they have not themselves made by failing to secure a majority of the bonds. They are as much entitled to use their bonds in payment as any other bondholders are. It is their misfortune if they have not as many bonds as others have. They have no equity to cast their misfortune upon those who own more bonds than they do. Permission to bondholders who are mortgagees to purchase at a sale of the mortgaged property and to pay by their bonds is not only usual, but it is highly advantageous to all persons who have an interest. It tends to enhance the price which may be obtained, and thus

benefits other creditors as well as the mortgagor. That large bondholders have an advantage over small ones, in that they are required to pay less in money, may be true; but it is an advantage they purchased when they obtained their bonds, of which it would be inequitable to deprive them. Such an advantage is everywhere recognized and protected,—notably in partition suits, and in sales of the assets of a partnership, as well as in many sheriffs' sales. Had there been but two creditors of the railroad company,—one holding $10,000,000 of the company's mortgage bonds, and the other $100,000,—it would be strange indeed if the former, buying at a foreclosure sale, might not pay with his bonds that proportion of his bid which would come to him; paying the rest in money, because the latter would be obliged to pay more in money if he had become the purchaser. The minority holder has no such equity to control the sale. The case supposed is in principle the one we have before us; for it is not to be doubted that creditors of a common debtor may combine to purchase the debtor's property at a judicial sale, though they may not combine to prevent others from purchasing. The decree now complained of puts no obstacle in the way of a purchase by the appellants; nor does the agreement of Oct. 1, 1876.

It follows from what we have said that neither of the appeals can be sustained.

It is ordered that the appellants in the first case pay all costs of their appeal, except the costs of the *certiorari* and return; including the printing thereof and the clerk's fees for copying, which the appellees are ordered to pay.

It is further ordered that Henry Jump, one of the appellants, shall not be charged with any costs that may have accrued since April 1, 1878, when he moved to withdraw his appeal.

And it is further ordered that the costs of the appeal in the second case be paid by the appellants.

*Decree affirmed.*

Mr. Justice Clifford, with whom concurred Mr. Justice Swayne, Mr. Justice Miller, and Mr. Justice Harlan, dissenting.

I am of opinion that the coupons which are by this decree

held to be a lien on the road were extinguished by payment; that the holders of them, who presented them for payment at the several places to which they were directed, had no thought of selling them, and, in fact, did not sell them, and, therefore, in law they were paid, and not sold.

I also believe that the attempt of Duncan, Sherman, & Co. to take up these coupons without paying them was deceptive and collusive, and was dictated by their interest in concealing from the public the fact that the railroad company was unable to meet those payments.