CASE 110—PETITION EQUITY—JANUARY 28.

# Lloyd, Trustee, v. Wagner, Assignee, &c.

## Same v. Same.

# Harper's Trustee v. Wagner, Assignee, &c.

## Same v. Same.

1. INSOLVENT CORPORATION—CLAIM OF PRESIDENT ON ACCOUNT OF INTEREST COUPONS PAID BY HIMSELF.—Where a corporation issued bonds with interest coupons attached, and after the insolvency of the corporation a number of such uncanceled coupons were found in the possession of its president, his claim against the corporation for the amount of those coupons, upon the ground that he had paid them out of his own means, can not, under all the circumstances, be sustained, it appearing that there was on the books of a bank of which he was the vice-president and chief managing officer, a large sum to the credit of the corporation of which he was president, and that the coupons were paid in the ordinary course of business. Nor can he be heard to say, with this bank under his management, that the credit thus appearing was a fictitious one, and that memoranda in the vaults of the bank show that the corporation was indebted to the bank in a

much larger sum; and, even if those memoranda be considered, it must be assumed that the charges which thus appear were for sums which went to pay the coupons or to reimburse the president of the corporation after he had paid them.

2. JUDICIAL SALES—RE-SALE OF PROPERTY.—The chancellor had the power to order a re-sale of property which had been sold under decree, the purchaser having failed to pay the purchase money notes.

H. P. LLOYD, C. L. RAISON, JR., FOR APPELLANT.

1. The coupons in the possession of Lloyd, trustee, are secured by the mortgage upon the real estate of .the Swift's Iron and Steel Works. (4 Am. & Eng. Enc. of Law, pp. 440, 442; Cameron v. Tome, 24 Am. & Eng. Railroad Cases, 203; Virginia v. Ches. & Ohio Canal Co., 32 Md., 501; Harbeck v. Vanderbilt, 20 N. Y., 388; Robinson v. Leavitt, 7 N. H., 100; James v. Johnson, 6 Johns. Ch. (N. Y.), 425; Union Trust Co. v. Monticello, &c., R. Co., 63 N. Y., 313.)

2. Although Harper was president of the company there was no law prohibiting him from purchasing these coupons and holding them as obligations against the company for the amount he gave for them. He bought them before maturity.   (Duncomb et al. v. New York, &c., R. Co., 84 N. Y., 190; Gould v. Little Rock, &c., R. Co., 52 Fed. Rep., 680; Lexington, &c., Ins. Co. v. Page, 17 B. Mon., 429; Evertson v. First Nat. Bank, 66 N. Y., 14; Ketchum v. Duncan, 96 U. S., 659.)

3. Suit may be brought on coupons detached from the bond.   (City v. Lawson, 9 Wall., 477; Commissioners v. Aspinwall, 21 How., 539; Walnut v. Wade, 103 U. S., 683; Thompson v. Perrine, 106 U. S., 589; Cromwell v. County of Sac, 96 U. S., 51.)

4. Payment will not be permitted in equity to operate as an extinguishment against those equitably entitled to substitution in the place of the party receiving payment.   (Waite's Actions and Defenses, vol. 7, 422; Richardson v. Washington Bank, 3 Met., 536; Morris v. Oakford, 9 Pa. St., 498; Eddy v. Traver, 6 Paige, 521; Matter of Fort, 8 Benedict, 228.)

Harper was equitably entitled to be substituted for Swift and Hubbard as against the company.   (Mattison v. Marks, 31 Mich., 421; s. c., 18 Am. Rep., 197; Waite's Actions and Defenses, vol. 4, p. 537; Wheeler v. Willard, 44 Vt., 601.)

5. Each coupon bears interest at 6 per cent. per annum from the date of its maturity.   (Town of Geneva v. Woodruff, 92 U. S., 502; Aurora City v. West, 7 Wall., 82; Welch v. First Div., &c., R. Co., 25 Minn., 323.)

6. The court has no jurisdiction in any case to order a re-sale of the property to satisfy sale bonds unless all the parties to the action

consent.   The lien of the sale bonds must be enforced by an independent action instituted for that purpose.

CHARLES J. HELM FOR APPELLEE.

1. There was a payment and not a purchase of the coupons by Harper.   They were paid at maturity at the place where payment was promised, and by the proper officer of the company which promised to pay.   (Ketchum v. Duncan, 98 U. S., 659.)

2. Harper is not entitled to subrogation.   (Ætna Life Ins. Co. v. Middleport, 124 U. S., 537; Shinn v. Budd, 14 N. J. Eq., 234; Sanford v. McLean, 3 Paige, 117; Hoover v. Epler, 52 Pa., 522; Gadsden v. Brown, Speer's Eq., s. c., 37, 41 ; Memphis, &c., R. Co. v. Dow, 120 U. S., 287; Suppiger v. Garrels, 20 Bradw., 625 ; Sawyer v. Hoag, 17 Wall., 623.)

  The mere payment of a debt for another, or the furnishing the means to do so, will not entitle the person paying it or advancing the money, *ipso facto*, to subrogation to the security the creditor held.   (Griffin v. Proctor's Adm'r, 14 Bush, 573 ; Newport, &c., Bridge Co., v. Douglas, 12 Bush, 714; Evans, &c., v. Rhea, 12 Ky. Law Rep., 226.)

JUDGE PRYOR DELIVERED THE OPINION OF THE COURT.

Edward Harper, on the 21st of June, 1887, then living in the State of Ohio, in the city of Cincinnati, made an individual assignment of all of his estate for the benefit of creditors.   The assignee appointed by the deed declined to act and resigned, when the present appellant, Harlan P. Lloyd, qualified in his stead, having all the rights and powers of the original trustee.

On the same day the corporation known as the Swift's Iron and Steel Works made an assignment for the benefit of its creditors to one Adam Wagner, who qualified and took charge of the corporate property.   The first assignment (by Harper) was made in Ohio, and that of the corporation in this State, the corporation doing business in the city of Newport.   The assignee of the corporation filed an action in July, 1887, in the circuit court of Campbell county, against the corporation and its credi-

tors for a settlement of the corporate estate, and obtained an injunction against the creditors preventing them from suing or further prosecuting actions against the corporation, one John Trapp having already instituted an action against the corporation.

On the 15th of January, in the year 1876, the Swift Iron and Steel Works executed a mortgage on the whole of its property to Sam'l F. Cary and John H. Morton, to secure the payment of certain first mortgage bonds that had been issued by the corporation, numbered from one to twenty, and each bond for five thousand dollars, payable in twenty years, with coupons attached of two hundred dollars each for the semi-annual interest on these bonds. Almira Swift held and owned eighteen of the bonds and L. T. Hubbard two of the bonds. The mortgage, the bonds, and, as is contended, the coupons, amounting to twenty-four thousand dollars, were unpaid at the time the Swift's Iron and Steel Works made the assignment. There is no question in regard to the validity of the bonds and their non-payment.

Edward Harper, at the date of his individual assignment in Ohio, owned a large portion of the stock of the corporation and was its president. The trustees under the mortgage came into the chancery court on the action of the assignee, and by proper pleadings set up their mortgage lien, asking for a sale of the property to satisfy these bonds and the interest. Lloyd, the assignee of the individual estate of Harper, came into the case and claimed that, from time to time, the latter had advanced out of his own means and purchased of the holders maturing coupons to the extent of twenty-four thousand dollars, or, at least, only asserts a right to that amount in

this controversy. His claim was presented to the master upon the general order of reference, and was allowed as an unpreferred claim, but upon exceptions to the report by other creditors the entire claim for the coupons was rejected and the report confirmed. From that order this appeal is prosecuted. There is some question as to the character of the pleadings and whether or not a final judgment was rendered from which an appeal could be taken.

It seems that the appellant (Lloyd) attempted to get in the case by a petition setting up the facts relating to his claim, and the filing of his petition refused; still it appears that the claim was presented to the master, proof heard upon it and the claim allowed, and afterward exceptions were filed to the report and sustained, rejecting his claim. We will therefore treat the claim as having been presented to the Master in the ordinary way, its allowance by him and its rejection by the circuit court, from which this appeal was taken. We think the order made, allowing the appellant by consent to be made a party and his petition taken as his answer, had reference to an independent claim for rent that had been offered before the claim for the coupons was asserted, and therefore can have no bearing on the question now presented.

These coupons were made payable to bearer, and at the Third National Bank of Cincinnati, Ohio, and when they fell due the money was paid by the teller or the cashier to the holders of these bonds. The coupons were never canceled but were, no doubt, believed by the holders to have been paid by the corporation. Matthews, its treasurer, however, says that the money to take up these coupons was furnished him by Harper, and he generally paid in

currency and not in checks.   That the steel works never furnished the money to him on his individual account to take up these coupons *to my knowledge, not directly.* That he delivered the coupons to Harper when he took them in, and it appears from the testimony that they were found in Harper's papers, after the assignment, in an envelope marked " *Personal property of E. L. Harper.*"

The books of the corporation also conduce to show that the corporation was largely indebted to Harper, and yet there is so much mystery in regard to this case, or the claim of Harper to these coupons, as must make the chancellor reluctant to place him in a position where he can swallow up the assets of the corporation by reason of claims that every one had reason to suppose had been paid. If he took up the coupons he did so without seeking a transfer or making known to the holders that he was advancing the money for the corporation; and while the mere possession of such paper would ordinarily authorize the presumption of their having been purchased, yet when found in the possession of one whose duty it was to see that the corporation paid the coupons, we are not willing to recognize such a doctrine.   Besides, it is singular that no one connected with the corporation knew that these advances were being made for its benefit, or that no credit was given Harper on the books for the expenditure out of his own means; and equally remarkable that these coupons would be paid off in currency, when it is shown that Harper had a large credit to his account in the Cincinnati banks and in the Fidelity Bank, of which he was the vice-president and chief managing officer, and in which the bank account of the corporation, for some years before the assignment, had been

kept.   He, in fact, owned the corporate property, and
when it comes to be insolvent, he meets the creditors of
the corporation with the statement that their liens upon
the property of the corporation I have extinguished, not
from the means of the corporation but from my own
pocket, and, therefore, I hold a prior lien.   A payment
made without the knowledge of the members of the cor-
poration, and certainly not at their instance or direction,
and to the holders of the bonds who believed the paper
was thereby extinguished.

In the years 1886 and 1887 the books of the Fidelity
National Bank showed a credit balance to the corpora-
tion of near one hundred and twenty-five thousand dol-
lars; and yet, it appears from the testimony of the teller
that, if the cash memorandums held by the bank against
the Swift's Iron and Steel Works had been charged up
to the corporation, the debt of the corporation to the
bank would have amounted to two hundred and seventy-
four thousand dollars, and that the credit on the bank
books given to the corporation consisted of checks on
banks and firms, drawn by the corporation, who were in
no manner indebted to it.

What was done with all this money, drawn from the
bank and evidenced by these memorandums, does not ap-
pear, and the presumption is that the process of with-
drawal had been going on for some length of time and no
charge made against the corporation for this large sum
that must have been made up of many items.   The cor-
poration may not have paid the coupons from its own
treasury, but the large drafts from the Fidelity Bank and
charged by mere memorandums to the Iron and Steel
Works, accounts, doubtless, for the manner in which

the money was obtained, either to pay the coupons as they became due or to reimburse Harper in the amount already expended by him.   The president of the one corporation and the vice-president and chief manager of the other, having both under his control, must be presumed under the circumstances of this case to have paid or ordered this money paid to the holders of the coupons as the corporation's money, and in full satisfaction of the several demands.   There is nothing in this case to imply a sale or to authorize this court to hold that any purchase was ever made by Harper from William Swift, the holder of the bonds; nor can Harper be substituted to the rights of the holder under the doctrine of subrogation.   It is said in the text books that this doctrine flows from a principle of natural justice and is a pure equity by which one who pays a debt is substituted to the rights of another.   (Sheldon on Subrogation, 2, 3.)

It may be insisted that the payment of these coupons was made by Harper out of his own means to protect his own interest, or that of the corporation, in which he was so vitally interested; and while this may be true when applied to a state of case where intervening rights are affected, it can not operate as against creditors in favor of one who, as president of a corporation and without the consent of the corporation or the directory, voluntarily places himself in a position where if the corporation remains solvent the claims are paid, and if insolvent he comes in with a lien over the creditors who have been confiding in the proper management of a corporation of which Harper was the president and owner of four-fifths of the stock.   This case is unlike that of Ketchum v. Duncan, reported in 96 U. S., 659.   In that case William

Duncan, of the firm of Duncan, Sherman & Co., notified
the company owning these coupons that they would pur-
chase on their own account sterling coupons, payable in
London.    The firm also telegraphed to the Bank of Mo-
bile and to the Union Bank of London to purchase the
coupons thus presented, for them, charging them with the
amount and transmitting the coupons uncanceled.    This
was done.    The railway company had no funds to meet
the coupons.    The banks were repaid by Sherman & Co.
the amount advanced for the coupons, and it never, says
the court, was intended by the firm of Sherman & Co.
that this should be regarded as a payment by the com-
pany of its coupons; and yet, in that case, four of the
judges dissented from the majority opinion.    The doc-
trine announced in the case of Duncomb v. Railroad Co.,
84 N. Y., 190, to which we have been referred, where the
president of the railway company received as a collateral
the bonds of the company to secure a debt honestly due
him, we regard as sound; but the difference in the facts of
that case and the one before us is so manifest that the de-
cision of the one case can in nowise control the decision
in the other.

The vaults of the Fidelity National Bank were open
to Harper.    In that bank was kept the accounts of the
Swift's Iron and Steel Works and the large amount of
currency, evidenced by the receiver's memoranda, drawn
out by the corporation, may have found its way to the
Third National Bank, as before stated, in payment of
these coupons or to reimburse Harper what sums he had
previously advanced for the corporation.    Harper must
have withdrawn this money without a check or an entry
on the books of the Fidelity Bank; and, with a credit on

the books of the bank of near one hundred and fifty thousand dollars in favor of the Kentucky corporation, the chanceller is told that this is merely fictitious, and if he will go to the drawers of the bank he will find the Steel Works, as is evidenced by memoranda, is indebted to the bank in a sum exceeding two hundred thousand dollars.

Harper, with the management of that bank under his control, ought not to be heard to say that the credit given the Iron and Steel Works on its books was fictitious, but this court would assume, as the chancellor below did, that this money paid was the money of the corporation and not Harper's.   Besides, Matthews, the treasurer of the corporation, in speaking of the payment by Harper, says, that he knows of no money having been furnished by the corporation *directly* to pay these coupons; and what he means by the expression is difficult to determine, and we think it evident there is an absence of all such equity in Harper's claim as would place him in advance of any creditor of the corporation, or that would authorize the chancellor to allow it as against the corporation.

There is another appeal on this record in which the creditors are complaining, or the corporation, of the act of the chancellor in ordering a resale of this corporate property to satisfy one of the purchase money notes.   The property of the corporation had been sold during the litigation, and the order of resale seems to have been made by consent.   We see no reason why the chancellor could not resell the property.   It left the securities in the purchase money bonds liable for any deficit, and it is the constant practice of courts of chancery to resell where the purchaser fails to pay.

There is a second appeal filed in this case in August,. 1891, from a judgment refusing to allow two lists of coupons, amounting to eight thousand dollars, to the assignee of Harper, the controversy being between the wife of Harper, the assignee of the Iron Works, and the appellant, Lloyd, as trustee of Harper.   The same evidence· applies in this case as in the first appeal.   There is no cross-appeal, but it is evident that Lloyd, as trustee, has no lien over the general creditors, and equally plain he is not entitled to recover on the many checks issued by the Iron Works, payable to its own order and found in his,. Harper's, possession.

The judgment appealed from on the appeals of August 17, 1891, are both affirmed, as well as the judgments from which the first appeal is taken. In other words, the judgments from which all the appeals are taken are affirmed.