[No. 1493.]

The Maxwell Cattle Co. et al. v. Henderson, Substituted for John Guthrie Smith.

1. Corporations—Securities—Payment—Purchase.

One corporation may purchase the bonds of another and share in the foreclosure of the security of such bonds, but where a corporation holding all the capital stock of another exchanges its bonds for the bonds of the other, whether or not such exchange is a payment of the bonds of the second company, or a purchase with a view to keep the bonds alive will depend upon the intention of the corporation taking up the bonds.

2. Corporations—Bonds—Payment—Purchase.

A land company leased all its lands to a cattle company and accepted in consideration all the capital stock of the cattle company. The cattle company issued bonds secured by mortgage on the leasehold. The land company afterwards took up most of the cattle company's bonds in exchange for its own secured by first lien on the land and all personal property of the land company. Under the facts of the

case it is held to be a payment of the cattle company's bonds and not a purchase, and that in a foreclosure suit on the balance of the cattle company's bonds those taken up by the land company are not entitled to a distributive share.

*Appeal from the District Court of Las Animas County.*

Mr. ANDRIEUS A. JONES and Mr. CHAS. E. GAST, for appellants.

Mr. THEODORE SHELDON, for appellee.

BISSELL, J.

Under leave, assignment of errors was filed in this appeal by the Maxwell Cattle Company and by Springer and others who became complainants by cross-bills filed in the foreclosure suit.    They were practically abandoned on the argument, and they could in no event be properly considered because the record preserves as to them no right of review.

The controversy which we determine is between the plaintiff in the foreclosure and the intervenors who may be correctly designated as the reorganization committee, representing certain interests in the Maxwell Land Grant Company.    The matter turns so entirely on the construction and legal effect of the securities, agreements, and acts of the parties representing the various interests that the principal discussion will necessarily be addressed to the ascertainment of what was agreed on, what was done, and the legal consequences flowing therefrom.    This necessitates an unusual fullness in the narration, and we will support our conclusions by arguments which will be based almost entirely on the exhibits, pleadings, and the stipulation between the intervenors and the complainant whereon principally the case was heard and on which the argument to this court has been very largely based.    As originally begun the suit was to foreclose a mortgage executed by the Maxwell Cattle Company.    The validity of the deed either as respects the formalities of its execution, or the

powers of the company or of its officers, is not called in question. A statement of what the two corporations were, their rights, interests and purposes, is essential to a clear understanding of the situation. As we approach and pursue the history of the documents involved we shall in each appropriate connection formulate our construction and state what controls our judgment.

The Maxwell Land Grant Company was a joint stock association organized under the provisions of the Commercial Code of Law of the Kingdom of Netherlands. Its seat was at Amsterdam and its life was for ninety-nine years, dated from May, 1880. It became the owner of what was formerly known as the Beaubien and Miranda grant, designated in these proceedings as the Maxwell grant, covering some 1,714,000 acres situate partly in Colorado and partly in New Mexico. Its right and title to these lands are not involved. In 1882 or thereabouts the Maxwell Cattle Company was organized under the laws of New Mexico. The identity of the incorporators is not disclosed and their personality is not important. After organization and to further its purposes, this company which will hereafter for convenience be designated as the cattle company to contradistinguish it from the former, which will be called the land grant company, procured from the latter on the 10th of October, 1881, a lease of all the lands included within the Maxwell land grant, containing 1,714,000 acres more or less, subject to a few unimportant reservations. The lease was for a term of thirty-eight years and was on the usual consideration of a specific agreement to keep and perform the covenants and conditions expressed in the instrument and on the further expressed considerations of $1.00, the payment of one third of the annual taxes assessed against the land to be paid as they should accrue and be assessed, the fencing of such portions as might be advisable, and the issue and delivery to the land grant company of all of its capital stock, 10,000 shares of the par value of $100 fully paid and nonassessable. It will be observed that by the terms of this agreement the land grant company thereby

became practically the sole and only stockholder of the organization. The importance of this as a factor will be more clearly developed when we reach the discussion of the prior lien gold bonds of the land grant company. Almost concurrently with the organization of the cattle company it authorized the issue of a series of bonds, 2,000 in number, for £100 each, due on the 1st of January, 1901. The specific terms are otherwise unimportant. These bonds were principally floated in the Kingdom of Great Britain, the Scotch taking the bulk of them. What was sold passed into the hands of various purchasers and there were many different owners when the adjustment of the affairs of the two companies began. The whole series was not sold. One thousand four hundred and forty-nine were unissued and 551 passed into the hands of various *bona fide* holders. The cattle company did not prosper. This business which had been so profitable in the late seventies and early eighties struck a period of depression and the cattle company was unable to earn money to pay its operating expenses and fixed charges. At this juncture the land grant company evidently felt the effects of the distress which had overtaken the cattle company and the persons interested in it began to cast about for plans which would make their enterprise profitable.

About the time the Netherlands association was organized it issued what is known as income bonds, which were payable absolutely forty years from their date, which would be two years after the expiration of the lease to the cattle company. They bore no fixed rate of interest. The profits to be derived by the holders of the income bonds must come from the distribution of a certain proportion of the net profits resulting from the operations of the grant company. Very little or no interest had been paid on these securities, and very little on the bonds of the cattle company. Presumably, although this does not clearly appear, there had been no dividends paid to the stockholders of either company. Business was at a standstill. It could no longer be profitably operated, and neither corporation had a working

capital which would enable it to continue operations. There-
upon this scheme was devised.    We are not advised as to all
the matters which led up to the completion of the arrange-
ment, nor can we wholly discover the motives which prompted
the parties to proceed.    The result, however, was that the land
grant company undertook to issue prior lien gold bonds to the
amount of $3,000,000.    These bonds were to be made a para-
mount security on the fee of the land owned by the company,
and of all of its rights and interests of every nature and descrip-
tion.    To accomplish this end it was necessary to get rid of
the income bonds which were liens on sundry of the interests
of the company.    They were disposed of by the consent of
the holders by the provision in the new mortgage that they
should be deposited with the trustees under that instrument
as further and collateral security for the payment of the prior
lien gold bonds.    Thus far we have seen no evidences of an
intention to look after or care for the cattle company's se-
curities.    When we reach the instrument securing the gold
bonds we find strong internal evidence of an intention on
the part of the land grant company to protect them.    As
stated the mortgage covered the realty, but it also covered
5,000 shares of the capital stock of the Raton Coal & Coke
Company, and the 10,000 shares of the capital stock of the
Maxwell Cattle Company, and all personal property of every
description within the limits of the grant.    It further pro-
vided that the trustees to whom the conveyance was made
should have full power to lease, contract for the sale of, sell
and convey any parcel or parcels of the land mentioned on
such terms as the trustees should designate as fair and rea-
sonable, and conferred on them full authority on the payment
of the consideration by the purchasers to convey whatever
tracts might be bought by good and sufficient deeds, which
should include the title of the company, the equitable rights
and claims of all the holders of the prior lien bonds and of
the income bonds which had been deposited.    This transfer,
this power, and this grant, are totally inconsistent with the
theory that the sole purpose of the land grant company was

to protect its own securities and provide for its own development. The stock of the cattle company was of no value if the lease was subject to the outstanding bonded debt, and it could not have been otherwise than to the interest of the land grant company to protect its bonds, because if those were paid the stock which had been pledged as collateral for the gold bonds was thereby enhanced in value, and the holders of the incomes advantaged to the extent at least of the interest which would otherwise be payable upon the cattle company's securities. The strong reason, however, is found in the grant of power to the trustees in the gold bonds to lease and sell the lands. This would only have been possible on the theory that all the interests of the land grant company and of the cattle company and of the income bondholders had been consolidated in the new security. If the cattle company's lease until the end of its term, thirty-eight years, was still in force the holders of the cattle company's bonds could foreclose and acquire title and hold it as against the company, and would have full power to lease, sell and convey. This argument simply shows the interest which the land grant company had in protecting the cattle company's bonds. The distribution of the funds resulting from the sale of those gold bonds was provided for, first, by the reservation of $275,000 for the payment of any interest on the new bonds in case of a deficiency in the revenue; second, $500,000 was to be paid to a board of trustees to be applied to the development and improvement of the land grant company's estate. It will be observed that this fund thus held out of the total issue was to be applied to the same purposes, and was designed to accomplish the same results contemplated by the organization of the cattle company. If the lease to the cattle company was in force.and they possessed the sole grazing rights, the reservation of $500,000 to put stock on it, improve and develop it, would have been manifestly futile. This is a circumstance which points to the conclusion that there was on the part of those interested in the reorganization scheme an intention to gather in all in-

terests, cover them by a blanket mortgage and provide for the subsequent development of the property.    At the time of the attempted reorganization in 1887 and 1888, a committee of five men was appointed by the Netherlands's interest,— Wertheim, Van Houten, Roelvink, Voorhoeve and Loman. This committee had certain evident powers, but the full limits of their authority are not disclosed by the record. It was probably what is known as a reorganization committee, to which was transferred all the various stock and bonded interests then outstanding, with power to negotiate for the surrender of outstanding securities and arrange the terms on which the new bonds could be exchanged for the old securities.    However broad or however narrow the authority may have been, it was evidently full enough, and embraced the one matter which we are considering, to wit, the cattle company's bonds.    After this committee had been appointed it entered into negotiations with what was evidently another committee appointed by the cattle company's bondholders of Great Britain, McNab and Greig.    We need not otherwise identify the committee because their personality is of no consequence, since we only desire to get at what the two committees agreed and at what was the scope, purpose and legal effect of the contract.    According to the agreement it was recited that the holders of the cattle company's bonds to the amount of £37,000 had conferred on the committee full power to negotiate, with the view to exchanging these bonds for new six per cent prior lien gold bonds to be issued by the land grant company.    It further recited that the reorganization committee of the land grant company had submitted to the others a scheme for the issue of new bonds on the security of the entire property of the land grant company.    It then recited that in consideration of the premises it was agreed that the cattle company's committee should secure the concurrence of all the holders of the cattle bonds, or as many of them as possible, to the proposed exchange; that whatever cattle bonds were deposited should be surrendered to the land grant committee on a specified ratio, with the payment in cash of

the arrears of interest on the cattle bonds at a fixed rate and the actual expenses of the trustees representing the bonds; and further, that until the concurrence of all the holders of Maxwell Cattle Company's bonds should be obtained, or due provision should be made for what might not be deposited, the trustees were not bound to release. The land grant company affixed another condition which is exceedingly significant. It was that the land grant company made the agreement only on the condition that the unissued cattle bonds numbering 1,449 out of the 2,000 which had been executed by the cattle company, should be canceled and delivered to the land grant company or its attorney, and until delivery that company was not to be bound. This was the contract into which the two committees entered. The foreclosure suit proceeded to issue on the part of the cattle company, and certain trustees, and the trustees under the new mortgage filed cross-bills. The terms of these cross-bills are unimportant with one solitary exception. It appeared from the terms of these cross-bills that a decree had been entered by one of the courts of New Mexico in a suit brought by the trustees under the gold mortgage to cancel the lease and clean up the title. According to the facts stated it would appear, and this is a matter about which counsel differ somewhat in their statement of the facts in this case, that the 551 cattle bonds under consideration were to be exchanged for an equal amount of the gold bonds of the land grant company, and bonds to this extent had been set aside by that company for the purpose. We are not at all clear that this is absolutely essential to the determination of the case but it is a significant circumstance, and since the whole question turns on conclusions to be drawn from what is found in the record, it would appear we have a right to consider it. After the original foreclosure suit had been put at issue by answers, cross-bills, denials and replications, the reorganization committee representing the land grant company filed a petition of intervention substantially reciting that they were a committee representing the holders of the income bonds and shares of the stock of

the land grant company, and as such committee had become
the owners of various bonds of the Maxwell Cattle Company
which they had acquired partly by the exchange of other se-
curities held and controlled by said committee, and partly by
purchases in the open market from various holders, and then
set out a list of 503 cattle bonds, and prayed that on fore-
closure they should be permitted to participate in the pro-
ceeds.    By stipulation, as well as by answer to the petition,
it appeared that the plaintiff conceded that the allegations
were true; that the intervenors acquired the 503 bonds, 447
of them by exchange of other securities under the authority
of the reorganization agreement of 1887 before referred to, and
fifty-six by purchase in the open market at the market value.
All the pleadings, exhibits and documents theretofore filed
in the case were to be considered as though everything had
been done while the intervenors were regular parties to the
suit.    The intervenors only sought to compel the recogni-
tion of their 503 bonds.

On final decree the petition of intervention was dismissed
and the parties bring the case here by appeal.

As we look at it, the opinion has been substantially written
by the statement of the facts which make the case.    Many
questions have been argued by counsel.    The appellant con-
tends that because there is no identity between the two cor-
porations known as the land grant and the cattle company,
there is no inherent legal or equitable difficulty in the land
grant company's acquiring the securities of the other, and
that in the ultimate foreclosure by any holder or party in
interest, it may assert its right through its trustees or other-
wise, whether acquired by the exchange of their own securi-
ties for the other or by purchase in the open market.    We
are not at all inclined to differ with counsel in respect to this
proposition.    When two absolutely independent corporations,
as were these, see fit to deal in each others securities, the
corporation or the committee representing it, or representing
the bondholders or stockholders of either may undoubtedly
go into the market and buy the securities of the other, and

when it comes to a foreclosure insist on the legal title thus acquired and participate in the results. With this principle there is no quarrel, and we are quite ready to agree that the appellee in his argument has carried the discussion of his contention too far. But the principle is not absolutely determinative of the issue. According to our notions this case falls directly within the line of some comparatively recent adjudications of the supreme court of the United States which this court followed in a case at the April term. *Ketchum v. Duncan,* 96 U. S. 659; *Wood v. The Guarantee Trust Co.,* 128 U. S. 416; *United Water Works Co. v. Farmers' Loan & Trust Co.,* 11 Colo. App. 225; *Central Trust Co. of New York v. Cincinnati J. & M. Ry. Co.,* 58 Fed. Rep. 500.

According to these authorities the only matter which we need consider is, whether the transaction between the reorganization committee of the Netherlands association and the Scotch committee, and the circumstances and conditions attending it, show a specific intention on the part of the land grant company to pay these bonds and not to buy them and keep them alive as active securities. If we so conclude it is an end to the argument and the intervenors are without rights. It is very difficult for us to conceive of a satisfactory answer to this proposition. We have already in the statement developed most of the facts by which it is supported. It is quite clear that the reorganization committee and the land grant company on whose behalf it acted proposed and intended when they issued the prior lien gold bonds to give security on all their assets and intended in so far as they could, to provide a security which should take the place of every other lien theretofore existing on the property. It was not otherwise that the security could be floated. We do not intend to hold that the income bonds might not on the subsequent maturity and payment of the gold bonds retake their place as living securities of the land grant company. We only hold that what that company did through its reorganization committee with reference to the terms, conditions, and circumstances of the execution and issue of the latter bonds

exhibited on their part an intention to take care of these par-
ticular cattle bonds.    It will be remembered that by the terms
of this new security there was pledged to the trustees not
only the fee, but the capital stock of the Raton Coal & Coke
Company, the entire capital stock of the cattle company, and
the income bonds.    If it was the purpose of the land grant
company to keep these bonds alive there seems to be no rea-
son why these bonds together with the incomes, and the
stock of the cattle company, should not have been pledged
with the trustees as an added security for the payment of
the gold bonds.    To conclude otherwise is to assume that
the reorganization committee pledged with the new trustees,
10,000 shares of the capital stock of the cattle company which
might almost immediately on the execution of the mortgage
be wiped out as a security by the foreclosure of the bonds
themselves.    The stock was of no value if the bonds were
to continue in force because in the absence of a provision for
their payment they would necessarily obliterate all the lease-
hold rights which the cattle company ever had or owned.
If the finding in the decree which the trustees pleaded in
the courts of New Mexico be sustained by the fact then on
the reorganization the land grant company set apart sufficient
of their gold bonds to provide for the outstanding issue of
cattle bonds.

Aside from these considerations, however, we find within
the terms of the reorganization agreement enough to satisfy
us that it was the purpose of the reorganization committee
to retire these bonds and remove them from the market, and
destroy them as a lien in order that the gold bonds, the issue
of which was the primary purpose of the reorganization, should
become an absolutely first-class security, provide funds for
the development and improvement of the property and thus
enhance the value of the stock interests of all persons con-
cerned, and provide a way for the payment of these bonds
and the reinstatement of the income bonds in their old posi-
tion.    The agreement between the two reorganization com-
mittees continually from beginning to end recited the purpose.

This was to exchange cattle bonds for land grant gold bonds. Now it may be true that this exchange furnishes no absolute and conclusive proof of an intention to pay and retire rather than to hold and ultimately enforce. We may have no right to draw from this exchange the conclusion that the bonds were to be retired. We do draw it however from other terms and conditions found within the four corners of the agreement. The Scotch reorganization committee agreed to procure, and they were bound to procure the concurrence of all the holders of cattle bonds, or of as many of them as they could. There could have been but one purpose, and that was to provide for their retirement and liquidation. It would not otherwise have made much difference to the reorganization committee whether the Scotch committee got all or part of them, whether all or part of them concurred if they were to be left outstanding, unliquidated and unsettled. The Scotch committee further agreed that whatever of cattle bonds should be deposited with them should be surrendered to the land grant company or their committee on the delivery of the gold bonds and the payment of interest. The phraseology is unfortunate if it was the purpose to keep alive and maintain the issue as a living security rather than to provide for surrender and payment. The Scotch committee also made provision for all the holders of bonds standing on the same level for they agreed that until the concurrence of all holders of cattle bonds was obtained or provision was made for such as might not be deposited, the trustees for the holders of the cattle bonds should be under no obligation to release any security which they had. This is another evident exhibition of the purpose on the part of the land grant company to provide for the retirement of the whole issue. But a more conclusive proof is found in the concluding part of the agreement, whereby the Maxwell Land Grant Company put in a condition that neither the company nor the reorganization committee were to be bound save on the condition that all the unissued bonds amounting to 1,449 which were distinctly specified by number should be canceled and delivered up to the land grant

company.   Primarily this condition was undoubtedly for the purpose of protecting the interests of all parties.   It may be argued it was for the purpose of protecting the interests of the land grant company in the 551 if they should get them, or their interest in those which they might acquire.   This does not impress us as true, but on the other hand we are convinced that it is a very plain exhibition of the purpose of the company and its committee to wipe out, cancel and destroy all these cattle bonds, so that the holders of the new gold bearing securities should have a mortgage covering all right, title and interest of the land grant company, its stockholders, bondholders and all persons having any interest in the fee or in the improvements on the property.   The reorganization committee were doubtless well convinced that in order to float these bonds and procure the funds with which to develop the property and relieve it from its difficulties, they must produce in the market a security which on its face would appear to be gilt-edged, and in reality would cover all the properties of the company supposed to be sufficiently valuable to float a loan of these dimensions.   We think they succeeded.   We are not so clear that they would have succeeded should we hold that the 503 bonds acquired by the reorganization committee were outstanding securities.   We do not believe that the allegations of the intervening petition or the stipulation of counsel compels the conclusion that this reorganization committee were as individuals the owners or purchasers of the cattle bonds.   The language of the petition and of the stipulation is, " as such committee they were the owners, and that as such committee they held and controlled these bonds ;" language which to our minds conclusively negatives the theory that these gentlemen were the purchasers.   Besides we believe that the good faith of the transaction would be subject to grave question should we hold that these 503 bonds were outstanding and living securities in the hands of this reorganization committee.   What would be the result? It must be this :  as holders of these bonds, this reorganization committee can foreclose their security and acquire the title of

the cattle company to the leasehold interest in all the Maxwell land grant for the unexpired portion of the term of thirty-eight years unless the land grant company is able to defeat the lease on plea and proof of a breach of some condition. The result would then necessarily be, the value of the gold bonds would be greatly impaired for the purchasers at the foreclosure being in possession of the leasehold right would be entitled to the practical occupancy of the whole estate and there could be no income to pay the interest on these gold bonds. We do not believe that these Holland gentlemen ever intended to bring about any such result. The uprightness and integrity of Holland bankers and merchants is too well established in the commercial world and too well known to readers of history to permit us to accept any such conclusion. Their purpose was an honest one to retire and cancel these bonds and to provide an adequate security for those who might be purchasers of the gold bonds. As we look at it, they succeeded and there is nothing for the land grant company to provide for, except the few bonds represented by the plaintiff in the foreclosure who did not come into the arrangement and who is now seeking to enforce the security for his own benefit and protection. What he may succeed in doing, even though the decree is enforced by sale is not clear to us, but about it we intend to express no opinion for the matter is not involved.

It is urged as another reason to support the contention, that these intervenors are in no position to assert the 503 bonds as existing obligations because the trustees in the mortgage securing the new gold bonds brought a suit in the courts of New Mexico to cancel and annul the lease for a breach of condition. According to the evidence the suit proceeded to decree, and if that decree bound any or all of the persons here interested, or who were named as parties to that suit, there must be very considerable question as to what the complainant in the foreclosure would obtain by his suit. It would also suggest a very grave inquiry whether these intervenors could insist on the enforcement of the bonds when they had

taken proceedings to forfeit the lease and destroy the property on which alone the bonds rested for their security. We recognize the force of the suggestion, but we are not prepared to either admit or discuss it because the record is not full enough to warrant a conclusion. The trouble is, we are unable to ascertain how far the trustees represented the intervenors or other persons in interest, nor do we know whether the trustees were authorized to file a bill in the due and orderly execution of their trust. Matters of notice are equally indeterminate, and taking the whole case together we believe it is wanting in some matters of proof indispensable to the consideration or settlement of this branch of the inquiry. It is only referred to out of deference to the arguments of counsel and not because it is a basis on which the opinion is put. As before suggested this is rested solely on one proposition, and that is, an evident intention on the part of the land grant company to pay and retire the cattle bonds.

As we look at the record, the intervenors have neither exhibited nor argued an error which entitles them to a reversal of the judgment which will accordingly be affirmed.

*Affirmed.*