Louis H. Himmel et al., Appellants, v. Melvin L. Straus et al., Appellees.

Gen. No. 38,845.

Opinion filed February 9, 1937.

SHULMAN, SHULMAN & ABRAMS, of Chicago, for appellants; MEYER ABRAMS, of counsel.

GOTTLIEB & SCHWARTZ, D'ANCONA, PFLAUM & KOHL-SAAT and SONNENSCHEIN, BERKSON, LAUTMANN, LEVINSON & MORSE, all of Chicago, for appellees; ULYSSES S. SCHWARTZ, CLAUDE A. ROTH, ISAAC E. FERGUSON and HARRY E. SMOOT, all of Chicago, of counsel.

MR. JUSTICE FRIEND delivered the opinion of the court.

Plaintiffs seek to reverse the order or decree of the superior court dismissing for want of equity their complaint, filed June 9, 1933, to set aside a decree entered by that court November 20, 1931, foreclosing the first mortgage trust deed securing $1,725,000 of bonds on property known as the Sheridan Cornelia Apartments, at 3500 Sheridan road, Chicago, and for other relief. When the matter came on for hearing on plaintiffs' exceptions to the report of the master, to whom the cause had been referred generally, the chancellor overruled the exceptions, approved the report and dismissed the complaint for want of equity. At the time plaintiffs filed their complaint the property had been sold pursuant to the decree of foreclosure, a plan for reorganization of the property had been accepted by 97.2 per cent of the first mortgage bondholders, all the second mortgage bondholders, and the owner of the equity of redemption, the plan had been consummated, and the new corporation formed pursuant to the plan had long been in possession of the property.

A brief summary of the circumstances leading to the foreclosure decree, the reorganization of the property and the interest of plaintiffs in this proceeding will promote a clearer understanding of the issues involved. The Sheridan Cornelia Apartments are located on the northwest corner of Cornelia avenue and Lake Shore drive. December 1, 1925, a first mortgage bond issue of $1,725,000 was placed on the property,

through S. W. Straus & Co. Thereafter, in 1926 and 1927, plaintiffs acquired $11,100 of the bonds. The interest on the principal indebtedness was paid up to and including June 1, 1931. $36,000 of principal became due December 1, 1931. The trust deed contained a provision that monthly deposits should be made on account of this maturity, and $6,000 had been so deposited. The 1928 taxes amounted to $25,870.70 of which there was paid on July 1, 1931, $17,243.13. The owner had filed objections to the 1928 taxes, which became delinquent July 10, 1930. The 1929 taxes became delinquent May 15, 1931, and objections thereto were filed by the trustee after he took possession of the property June 26, 1931.

May 25, 1931, S. W. Straus & Co., the house of issue, notified the bondholders in writing that while the June 1, 1931, interest would be paid, the mortgagor was in default in its deposits for the December 1, 1931, maturity of principal, and that a committee had been organized under a deposit agreement of May 22, 1931, consisting of some of the officers of S. W. Straus & Co., to reorganize the property. Thereafter, July 1, 1931, the foreclosure proceeding was instituted and the decree of foreclosure and sale was entered November 20, 1931, finding an indebtedness of $1,600,000 due the trustee for the first mortgage bondholders and $200,000 to the holders of bonds under the junior mortgage.

Counsel for defendants characterizes this as one of the early reorganizations of real estate properties in Chicago. The plan of reorganization was not submitted to the court for approval in connection with the confirmation of the sale in conformity with more recent practices. Neither does it appear that the court approved the plan or exercised any jurisdiction over it. However, when the master's report of sale came on for confirmation the details of the plan were fully explained to the court, and the order of confirmation re-

cites that the chancellor was advised of the plan and of the participation of bondholders therein.

In January, 1933, the reorganization of the property was completed by conveyance of title to the new corporation, and in March of that year the committee advised the bondholders, including plaintiffs, of that fact and that new securities to be issued to them were ready for distribution. The instant proceeding, by which plaintiffs seek to attack collaterally the decree of foreclosure entered some eighteen months prior thereto, was instituted June 9, 1933. At that time there was due a balance on the 1928 taxes, all of the 1929 taxes were delinquent, and the 1930 taxes had not been paid. It appears from the record that since then all these taxes have been discharged, and the 1931 taxes, of approximately $29,000, have been paid down to a balance of $1,535.85, which was protested. As of June 25, 1934, when the cause was on hearing before the master, the first half of the 1932 taxes of $11,374.94 had been paid, and the corporation then had on hand sufficient funds to pay the second half when they became due.

Plaintiffs deposited their bonds with the reorganization committee July 2, 1931, and they complain at the outset that they were not permitted to withdraw these securities when the plan of reorganization was announced. A summary of the plan was mailed to all the bondholders [including plaintiffs] December 15, 1932. A notice accompanying the plan apprised the bondholders that under the terms of the deposit agreement any bondholder dissenting from the plan of reorganization might, within 30 days after notice thereof, withdraw his bonds by (1) a written notice of dissent; (2) a remittance to the committee for its proportionate share of the expenses, and (3) a certificate of deposit duly indorsed, with bank guarantee of the indorsement. About a week after the plan was announced plaintiffs made an oral request on the sales manager of Straus &

Co. for the return of their bonds, but none of them ever made a demand, written or otherwise, on any member of the committee or its secretary or on the depositary. Neither did they tender or pay the proportionate share of the expense requisite for withdrawal. The requirements imposed on dissenting bondholders for withdrawing their bonds were not unreasonable, and since plaintiffs had assented to and were bound by the provisions of the deposit agreement by accepting their certificates of deposit they could not withdraw their bonds without complying with the requirements thus imposed. They filed this proceeding as *depositing* bondholders, seeking relief as "representatives of this class," and while they say in their brief, in the first sentence of "the statement of the case," that by this equitable proceeding they are "seeking rescission of the deposit of the bonds," neither their complaint nor the amendment thereto prays for any such relief, nor do they urge this among their numerous points relied on for reversal. They are thus in the anomalous position of depositing bondholders, who, having been given an opportunity to dissent from the plan of reorganization and to withdraw their bonds, failed to do so and are now complaining of the reorganization plan to which they impliedly gave their consent.

Plaintiffs charge fraud and misrepresentation in the sale of bonds to them; fraud in obtaining the decree because the interest of the trustee was in conflict with that of the bondholders; that the foreclosure was a prelude to a reorganization, which is characterized as fraudulent, unfair, inequitable and initiated to foreclose the interests of the bondholders; that the property was sold to the nominee of the committee, at a ridiculously low price, which, coupled with the fact that it excluded competitive bidding by the owner of the equity of redemption, indicated a scheme to place the reorganization committee in control of the property,

and therefore constituted fraud *per se;* that the trustee was an officer of the promoting company and owed an obligation to the bondholders to protect their interests, independently of the terms of the trust deed; and that the approval of the sale under the plan of reorganization was designed to evade the Federal Securities Law, and was therefore fraudulent and void.

The charge of fraud and misrepresentation in the sale of the bonds to plaintiffs relates principally to printed material accompanying the sale of the bonds, which is explanatory of the slogan "43 years without loss to any investor," employed by the house of issue in its sales statements. This pamphlet, entitled "What our Slogan means," represented in substance that since the establishment of the house of issue in 1882 every bondholder had received in cash on the due date both principal and interest, without requests for renewal of any kind; that there was always a market for Straus bonds, which were accepted by the house as collateral for 30 or 60-day loans; that the representation "No investor ever lost a dollar," was assurance of the soundness of the investments and of the care with which the interests of Straus clients were at all times safeguarded. The master specifically found that there was no evidence tending to show that any of these representations were untrue at the time plaintiffs received the statements, and in the absence of such showing plaintiffs cannot predicate charges of fraud and misrepresentations upon them. Some three years subsequent to the sale of the bonds a pamphlet was delivered to one of the plaintiffs, which contained material under the heading "our duty to our clients." Plaintiffs charge that this material likewise contained misrepresentations. Since, as the master found, this pamphlet was received more than three years following the purchase of the bonds, the representations could not have been instrumental in inducing plaintiffs

to purchase these securities, and are therefore immaterial.

It is next urged that the trustee was disqualified to act because of his conflicting interests, rendering the jurisdiction of the court colorable and the proceedings had thereunder null and void. It is argued that the foreclosure was instituted by the trustee for the equal protection of all bondholders; that the trustee, however, disqualified himself because of the personal gain he was to receive from the results of the reorganization plan, by which his organization gained control of the property and accepted fees; and that there was no one to represent the bondholders. *White v. Macqueen,* 360 Ill. 236, is cited and portions of the opinion are quoted to sustain the contentions made. In that case the complaint alleged that the building corporation deposited with the trustee money with which to pay the interest on the bonds when due, but that he failed to make the payment; that the trustee from time to time misappropriated to his own purposes funds deposited with him. The trustee there was charged with formulating a plan to profit personally from the foreclosure; with soliciting and acquiring bonds in exchange for other securities of less value by means of fraudulent representations concerning the value of the bonds involved, and with using and misusing for his own purposes trust funds deposited with him. No charge of personal misconduct is made against the trustee in this proceeding, and the portions of the opinion quoted by plaintiffs to sustain the contention of conflicting interests have no applicability to the facts of the instant case. The court, by its decree of November 20, 1931, found that the trustee was the proper representative of the bondholders and that their interests were not in conflict with his. It also found that the bondholders were not necessary parties; that there were defaults as alleged in the complaint, and that the only interest of the trus-

tee was properly to foreclose the trust instrument. In so doing he acted promptly and effectively. The decree fixed the rights of the parties, ordered the property to be sold if the indebtedness was not paid and directed that any sale had under the decree be confirmed by the court. As to the conflict of the trustee's interest with that of the bondholders, it appears from the evidence that the trustee did not participate in the conference at which the committee was formed. Plaintiffs charge that he co-operated with the bondholders, although there is no proof that he did so improperly, and the mere fact of his co-operation would not of itself indicate that fraud had been practiced by the committee or by the trustee. (*American National Bank & Trust Co. v. Illinois Improvement & Bldg. Corp.*, 281 Ill. App. 17.) Neither is there any evidence that the trustee had any interest in this bond issue or the property securing it, except as the trustee under the indenture. He was a member of S. W. Straus & Co., but that firm was not interested in the reorganized property and had no interest in the second mortgage or in the mortgagor company. Neither S. W. Straus & Co., nor the trustee, received any of the stock in the reorganized company, nor did they have any control over the property. Mr. Straus received compensation for his services as trustee in possession, amounting to about 1½ per cent of the gross receipts, and was also compensated for his services in foreclosing the trust deed, in accordance with the provisions of the trust instrument. These facts, of themselves, do not constitute a conflict between his interests and those of the bondholders. So far as we can determine the foreclosure proceeding was properly brought and expeditiously prosecuted to sale. No actual fraud is charged, nor were there shown any facts or circumstances from which fraud could be inferred. The rule is well settled that every presumption is in favor of the validity of

the proceeding (*People v. Culver*, 281 Ill. 401, 404) and no convincing reason is disclosed by the record to rebut that presumption.

But plaintiffs argue that the trustee's position in this proceeding was different from that of the ordinary trustee who is not connected with the house of issue; that being a member of the Straus & Co. organization his duties and responsibilities were much greater. They say it was his duty to inform the bondholders of the defaults in the nonpayment of taxes and in the monthly deposits, and that his failure so to do made him personally liable; that he was obliged to protect the interests of the bondholders, attend the sale, object to the inequitable bid, all of which he failed to do; that he cannot institute proceedings and then be conspicuous by his absence and remain silent; that it was to the interest of his company and his associates to carry out the plans for reorganization and obtain the property at the lowest bid, and this position, they say, was inconsistent with his duties as trustee. All these arguments suggest that by reason of his position as officer of the promoting company the trustee had the obligation to protect the interests of the bondholders independently of the terms of the trust. Several cases from other jurisdictions are cited which suggest this rule, but our Supreme Court in *Chicago Title & Trust Co. v. Robin*, 361 Ill. 261, defined the duties of the trustee, as follows:

"Since the rights, duties and obligations of the trustee were contained and defined solely in the trust deed, its duty as trustee was simply to sell the property to satisfy the debt. *Darst v. Bates*, 95 Ill. 493."

As to the failure of the trustee to inform the bondholders of defaults in the payment of taxes and in making monthly deposits, we find the following facts established by the record: On May 25, 1931, the trustee notified the bondholders that the 1928 taxes became

delinquent July 10, 1930. There was thus a delay of some 10 months before foreclosure proceedings were instituted. The 1929 taxes became delinquent May 15, 1931, which was only 10 days prior to the trustee's notice. The owner had paid $17,243.13 on the 1928 taxes and filed objections to the balance, and was regarded as responsible by the trustee. It does not appear that anything was lost to the bondholders by not instituting foreclosure proceedings 10 months earlier, inasmuch as the mortgagor deposited all the income with the trustee and subsequently all delinquent taxes were paid. Plaintiffs argue that in 1928 or 1929 there was a market for Straus bonds; that the house was repurchasing these bonds and making loans on them at the time; and that if the bondholders had been informed of the true condition they "might have unloaded their bonds on the house." Inasmuch as these taxes did not become delinquent until 1930, there was no occasion for notifying the bondholders earlier, and in 1928 and 1929, when plaintiffs' counsel say there was a market for Straus bonds, the delinquency in taxes had not yet occurred. It has generally been held that the trustee is bound to exercise an honest and sound judgment as to the time to foreclose. (*Rhode Island Hospital Trust Co. v. S. H. Greene & Sons Corp.*, 50 R. I. 305; *New York Security & Trust Co. v. Lincoln St. Ry. Co.*, 74 Fed. 67.) The trustee was therefore under no obligation to foreclose immediately on the tax default, and the delay cannot be charged as a neglect of duty.

The failure of the trustee to attend the sale is next charged as a violation of duty. He was represented at the sale by his attorneys, and inasmuch as neither the trust deed nor the law requires him to attend personally, this contention is untenable. Plaintiffs also charge that the failure of the trustee to object to the bid of $338,000 constituted a violation of his trust du-

ties.  It was held in *Chicago Title & Trust Co. v. Robin, supra,* at 271:

"It was for the creditors, and not the trustee, to see that the property was not sacrificed."  Moreover, after advertising the property and holding the sale pursuant to the decree to the highest bidder, the master made his report of sale to the court.  On confirmation thereof the trustee appeared by his counsel and advised the chancellor fully as to all the facts and circumstances in connection with the sale, including the plan of reorganization.  He performed his duty as trustee when he reported fully to the court.  The chancellor, after being apprised of all the facts, considered the bid adequate and confirmed the sale.  No showing was made by plaintiffs that if the chancellor had refused to confirm the sale, and ordered a resale, that a higher bid would have been obtained, and any suggestion to the contrary is purely conjectural.

It is next urged that the trustee delegated his duties after entering into possession of the property, contrary to the elementary principles of the administration of trusts.  This charge has reference to the management of the property.  The master found that there was no fraud in connection with the management of the property, that the trustee was assisted in operating the building by the management department of S. W. Straus & Co., and that John K. Murphy, a competent person, was placed in charge as his agent.  Since these findings were not questioned by plaintiffs' exceptions, they cannot now object to them.

Plaintiffs' principal complaint is that the proceedings were initiated to foreclose the interests of the bondholders who would not surrender their rights to the "self-appointed committee."  They argue that this was not a bona fide foreclosure proceeding, but only a prelude to a reorganization, which is characterized as

fraudulent, unfair and inequitable; that representations were made to the nondepositing bondholders that the sale would be held under prevailing conditions at which no outside bid, reflecting "a fair value of the property" was probable, and that the committee would purchase at the sale and the share of nondepositors would be "substantially less." It is charged that "the helpless isolated bondholder was thereby coerced to become a depositor. He well knew he was in no position to compete with the committee which accumulated a large percentage of the bonds, which it could use in lieu of cash on such a sale, while the individual bondholder needed all the cash. The committee placed itself in a masterful position by its contract with the mortgagor to acquire the equity of redemption so that it thereby controlled the sale. If an outsider would bid the committee could redeem in the name of its dummy nominee. If the committee became the purchaser at any price no bondholder could redeem from such a sale. The dissenters were required to pay 2 per cent. The depositors were compelled to remain depositors and the nondepositors were coerced to part with the legal and equitable title of their securities and to intrust them to persons who did not invest anything in the project and who organized themselves as the alleged protectors, but in reality, as the profiteers at the bondholders' misfortune."

It has frequently been said that unless bidders could bid collectively at sales of this character they probably could not bid at all and there would be no sale, and indefinite delay of the sale would result to the detriment of all bondholders. The practice of using deposited bonds to bid at sales has been generally approved. The fact that individual bondholders are not in a position to compete with committees which have accumulated large percentages of the bonds, is well

stated in *Ketchum v. Duncan*, 96 U. S. 659, as follows (p. 673):

"It is said this enables those who have subscribed to that agreement, and who are a large majority of the bondholders, to purchase on paying a much less sum in money than would be required of other bondholders who have not signed the agreement. This is true; but we do not perceive that it is inequitable. After all, it makes no distinction against the minority which they have not themselves made by failing to secure a majority of the bonds. They are as much entitled to use their bonds in payment as any other bondholders are. It is their misfortune if they have not as many bonds as others have. They have no equity to cast their misfortune upon those who own more bonds than they do. Permission to bondholders who are mortgagees to purchase at a sale of the mortgaged property and to pay by their bonds is not only usual, but it is highly advantageous to all persons who have an interest. It tends to enhance the price which may be obtained, and thus benefits other creditors as well as the mortgagor."

The principle thus enunciated was adhered to by the Supreme Court of the United States in *Kansas City Terminal Ry. Co. v. Central Union Trust Co.*, 271 U. S. 445, wherein it said (pp. 453–54):

"It now may be announced as settled doctrine, that where the value of corporate property to be sold under foreclosure is so great as to render co-operation between bondholders and stockholders essential in order to secure a bidder and prevent undue sacrifice of their interests, they may enter into a fair and open arrangement to that end." In this connection it should be noted that not one of the nondepositing bondholders, holding less than three per cent of the bonds, objected to the sale. Competitive bidding was not excluded, and as the court said in *Ketchum v. Duncan, supra,* it is the misfortune of the individual bondholders "if they have

not as many bonds as others have. They have no equity to cast their misfortune upon those who own more bonds than they do. . . ." The assertion that the depositors were compelled to remain depositors, and the nondepositors were coerced to part with the legal and equitable title of their securities, is not a justifiable statement, because depositors had the option of withdrawing their bonds upon compliance with reasonable provisions to which they had consented, and nondepositing bondholders, who were in a position to dissent, made no objection.

The charge that the reorganization plan was unfair and inequitable could well be dismissed without further comment, because plaintiffs pray for no relief in regard to the plan. Nevertheless they attack certain portions thereof. They say that "even the privilege to elect directors for the new corporation was taken away." This has reference to the voting trust created under the plan, which under the agreement could be terminated at any time by the direction in writing of 66⅔% of the outstanding trust certificates. Apparently the chief purpose of placing the stock in a voting trust was to insure a quorum at stockholders' meetings so that the business of the newly organized corporation could be transacted. With a widely scattered group of stockholders who had been given stock in lieu of their bonds it would manifestly be impossible to transact business, and this difficulty was anticipated by placing the stock in a trust to insure efficient management. The trustees were mostly disinterested persons of recognized standing, and the provision for termination of the trust operated as a safeguard for the stockholders of the corporation.

Plaintiffs' counsel complain also because 10 per cent of the stock of the reorganized corporation was awarded to the owner of the equity of redemption and second mortgage bondholders, contending that it de-

prived the first mortgage bondholders of their property without due process of law, in violation of the constitution. No complaint of this allotment was made in the bill, nor was the point presented to the trial court on exceptions to the master's findings. The record discloses that two per cent of the stock was allotted to the holder of the equity of redemption, and eight per cent to the holders of $200,000 of second mortgage bonds. The junior interests co-operated with the trustee at all times, beginning with the original default. They assisted in the reorganization, made available their right and interest in the property to the committee by conveying title to the new corporation, and caused the second mortgage to be canceled and released. A similar objection was raised in *Allen v. Georgian Hotel Corp.*, 82 F. (2d) 917, of the Circuit Court of Appeals for the Seventh Circuit, filed March 31, 1936, not yet reported. In that case the plan of reorganization provided for a new company, with an issue of 20,000 shares of common stock to take over the assets of the debtor. The stock was allotted, 70 per cent to the holders of the first and second lien bonds and 30 per cent to the second mortgage bondholders, general creditors and stockholders of the debtor. In discussing this question, the court said (pp. 919–20):

"As to allotment of 30 per cent of the stock to the subordinate creditors, we believe that this was fairly within the judicial discretion of the District Court. While it is not likely that at the present time the subordinate creditors would have realized anything if the first mortgage had been foreclosed, these creditors would, for three months after one year following the foreclosure sale, have had a right of redemption—a right which might have been valuable. And there is the possibility that, with a substantial 'come-back' in affairs, property values may increase sufficiently to

give the debtor a substantial equity in the property of which these creditors would have the benefit. Such possibilities would tend to support the court's discretion in making some allowance to these creditors in a proceeding under which there is to be effected a present adjustment of all the claims against the debtor, of whatever rank or class. This was evidently the view taken by the district court, and it receives support from *Warner Bros. Pictures, Inc. v. Lawton-Byrne-Bruner Ins. A. Co.,* 79 F. (2d) 804. We see nothing in the plan or the record tending to indicate abuse of the court's discretion in this respect.'' The section of the constitution which this procedure is charged to have violated is not pointed out by plaintiffs nor discussed with sufficient particularity to warrant further comment.

We find no merit in the various contentions made by plaintiffs nor any justification for the manifold charges of fraud lodged against the trustee and others connected with this foreclosure and reorganization. The proceeding was properly brought, expeditiously prosecuted and the premises sold in accordance with the decree of the court under circumstances fully in keeping with the prevailing economic conditions. The property was reorganized by January, 1933, under a plan which did not deprive the bondholders of the value of their securities, as plaintiffs charge, and ''place control of the property for fifteen years in the hands of persons who betrayed the interest of the bondholders in the past,'' but replaced their bonds with stock of the new corporation and vested in them the ownership of the property which secured their bonds, in place of merely a lien thereon. Unless the trust is sooner terminated, the property will for 10 years, and not 15 years, as plaintiffs state, be in control of a board of trustees, composed of L. J. Harris and Maurice A. Riskind, representing the junior inter-

ests, who were never directly connected with S. W. Straus & Co., J. C. McCord, who is not connected at all with the Straus interests, Frederick W. Straus, who severed his connection with the house of issue in 1933, and Sidney H. Kahn, president of the Straus Service Corporation, the depositary of the stock trustees. Under the plan the nondepositing bondholders, who constitute less than three per cent of the bonds, received in excess of twenty cents on the dollar, and the other 97.2 per cent, the depositing bondholders, own the property. The delinquent taxes have been paid by the trustee, and so far as the record discloses the property is being well managed and in excellent condition. So far from being an unfair, fraudulent and inequitable venture, as is charged in the complaint, it appears to us that this is rather an outstanding reorganization of valuable property, with which the overwhelming majority of bondholders, who are now stockholders, seem perfectly satisfied. The only persons complaining are holders of $11,100 bonds, and their complaint is not well founded in fact or in law. Stock in the newly organized corporation is still available to them should they decide to join with the other bondholders in accepting their share of the stock. The decree of the superior court dismissing the complaint for want of equity is affirmed.

*Affirmed.*

John J. Sullivan, P. J., and Scanlan, J., concur.